IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| EUGENE PITTS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.  2:13-cv-180-MEF |
| | ) | (WO – Do Not Publish) |
| STATE OF ALABAMA PUBLIC | ) | |
| SERVICE COMMISSION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants State of Alabama Public Service Commission ("PSC"), Lucy Baxley ("Baxley"), Twinkle Andress Cavanaugh ("Cavanaugh"), and Terry L. Dunn's ("Dunn") (collectively, "Defendants") Motion for Summary Judgment (Doc. #29). Plaintiff Eugene Pitts ("Pitts") brings this lawsuit pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. §§ 1981 and 1983 for alleged race discrimination by Defendants against Pitts while he worked at the PSC and for discriminatory termination and failure to re-hire.  For the reasons discussed below, Defendants' motion for summary judgment is due to be GRANTED.

**I. JURISDICTION AND VENUE**

The Court has subject-matter jurisdiction over the parties' claims under 28 U.S.C. §§ 1331 and 1343(a)(4).  The parties do not dispute that venue is proper under 28 U.S.C. § 1391(b), and the Court finds adequate allegations supporting both.

1

## II. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine [dispute] of material fact." *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–23.

Once the moving party has met its burden, the non-moving party must "go beyond the pleadings and by their own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotations omitted). To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A plaintiff must present evidence demonstrating that it can establish the basic elements of its claim, *Celotex*, 477 U.S. at 322, because "conclusory allegations without specific supporting

2

facts have no probative value" at the summary judgment stage. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

A court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). After the non-moving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

### III. FACTS

The Court has carefully considered the submissions of the parties in support of and in opposition to the motion. The submissions of the parties, taken in the light most favorable to Pitts, the non-moving party, establish the following material facts:

**A.  The PSC**

The PSC is a statutorily-created agency of the State of Alabama that is governed by three elected public service commissioners: a president, place one commissioner, and place two commissioner. The PSC's function is to regulate various utilities and transportation entities in Alabama. The commissioners are the Appointing Authorities for the PSC and are the final decisionmakers for all hiring, firing, disciplinary, and promotional decisions for PSC employees that are relevant to this case. At least two commissioners must vote on these types of employment decisions.

Cavanaugh and Dunn were elected as commissioners on November 2, 2010, at which

time Baxley was the president of the PSC. On November 6, 2012, Cavanaugh was elected president and replaced Baxley. Jeremy H. Oden was appointed by Governor Robert Bentley to replace Cavanaugh's former position as place one commissioner in December 2012. Cavanaugh, Dunn, and Baxley are all white.

The PSC's hiring procedures are regulated by the State Personnel Department ("SPD"). Under the SPD's hiring procedures for merit system jobs, vacant positions within the PSC are publicly posted on the SPD's website and sometimes internally at the PSC. The PSC establishes different registers for various employment decisions, such as open-competitive employment, promotions, and re-employment. To get on a register for a particular position, an employee or applicant must submit an application and meet certain minimum qualifications. The employee or applicant may then be given additional tests, evaluations, or questionnaires by the PSC. After these evaluations, the candidates are ranked and their names are then placed on the register. When the PSC wants to hire or promote someone, it requests a Certificate of Eligibles, which consists of the top ten eligible applicants on the register, plus the names of all applicants whose grades are tied with the tenth highest eligible.

**B.    Pitts's Employment at the PSC**

Pitts, who is black, began working at the PSC as an Advisory Staff Certified Public Accountant on July 2, 1990. Pitts was hired as an unclassified, at-will employee outside of the state merit system. Such employees are referred to as "Act 44" employees because the Alabama Code Section creating them was Legislative Act no. 44 of the 1st Executive

Legislative Session of 1977. Pitts remained in this position during the entire course of his employment with the PSC.

During his employment at the PSC and at all times relevant to this suit, Pitts's immediate supervisor was Judy McLean ("McLean"), a white female. Pitts claims that McLean began harassing him based on his race some time around 2005 or 2006. Pitts accuses McLean of requiring him to maintain more than 100 hours of accumulated vacation time, which he states she did not require white employees to do. McLean responds that she never required Pitts to maintain 100 hours of leave, but that she did encourage him to do so on occasion as the result of her belief that all employees should have enough leave built up to provide a buffer in case of an unexpected event. In his deposition, Pitts admitted that McLean discussed maintaining 100 hours of leave with him only twice in his twenty-year tenure with the PSC. (Doc. #31-5, at 54–55.) McLean never disciplined Pitts for failing to maintain 100 hours of leave.

Until October 2010, McLean's only attendance policy for the salaried employees like Pitts, who were not required to keep time sheets, was that they sign in and sign out when entering or leaving the office. McLean states that she began to have concerns that her policy of allowing salaried employees to manage their own leave was resulting in excessive absences. As a result, she instructed two administrative assistants, Rozetta Parker ("Parker") and Jodie Byrd ("Byrd"), to monitor the arrival and departure of division employees. McLean states she can recall only one occasion that she requested Byrd to monitor Pitts specifically because McLean was frustrated that she had been unable to locate him. Parker

5

and Byrd both submitted affidavits in which they state they were told informally by McLean to monitor adherence to the sign-in and sign-out requirement but that they were never told specifically to monitor Pitts.  Pitts asserts that he was singled out by McLean for monitoring and that she had Parker and Byrd monitor him specifically based on his race.  However, Pitts presents no evidence to dispute the accounts provided by McLean, Parker, and Byrd.[1]  Pitts also states that two white employees would come in late on occasion and McLean would say nothing.

     Pitts next claims that McLean treated him differently based on his race by requiring him to keep time sheets.  On October 15, 2010, McLean issued a memorandum to members of her department requiring all employees to keep time sheets, including the salaried employees, such as Pitts, who were not previously required to keep time sheets.  This requirement was binding on all employees in McLean's division, not just Pitts, and was the result of a change in policy by McLean after she came to the belief that her laissez-faire attitude towards attendance and use of leave was resulting in excessive absences.  McLean states that Pitts's frequent absences from the office were one factor that motivated her to

---

[1] Pitts's statements exhibit the fallacy of *argumentum ad ignorantiam*, i.e. when a lack of evidence is cited as proof that a statement is false.  Pitts states that Parker and Byrd admitted they were monitoring him in a discriminatory manner because, when he told them he thought they were discriminating against him, "They didn't tell me that it wasn't," and that they were instructed to watch only Pitts because "They didn't mention anybody else [by] name," and that he stated to Byrd the monitoring was harassment and "she didn't disagree with that." (Doc. #31-5, at 29–30.)  Parker and Byrd's failure to say anything one way or the other is no proof at all that the statements in their sworn affidavits are false.  Therefore, Pitts's display of sophistry is insufficient to create a factual dispute about whether he was specifically monitored by Parker and Byrd, who are both black, based on his race.

implement the time sheet requirement, and that Pitts's frequent absences resulted in some staff members giving him the nickname "the Shadow."[2] It is undisputed that the requirement to keep time sheets applied to all employees in McLean's division regardless of race.

Pitts accuses McLean of changing his leave slips to show that he was not in the office even when he was there. McLean denies this and recalls one occasion when she modified one of Pitts's annual leave slips to reflect the true amount of time he had taken off but that she made the change after discussing the matter with Pitts and getting his agreement. Pitts admits that on the two occasions on which McLean changed his leave slips even though he was actually in the office, McLean corrected the changes after he discussed the matter with her. Finally, Pitts states that McLean had him do tax returns for her relatives, which she did not ask white employees to do. However, in his deposition, Pitts stated that McLean asked him to prepare tax returns for her parents as a favor. Pitts states that he felt intimidated by the request and that he "didn't necessarily want to do it," but also admits that he did not express any misgivings to McLean when he agreed to do the tax returns. (Doc. #31-5, at 50.) Pitts prepared tax returns for McLean's parents for the years 2004 and 2005 and returned them to McLean, who thanked him for his work.

Pitts states that he enjoyed a cordial relationship with McLean for the first fifteen years of his employment. Over the course of Pitts's twenty-year employment with the PSC,

---

[2] An affidavit by John Free, an employee who worked in the same division as Pitts, corroborates McLean's statement that Pitts was nicknamed "'the Shadow' due to the inordinate amount of time he was away from his office." (Doc. #31-12, at ¶5.)

7

McLean gave him good evaluations and told him that he was doing a good job from time to time. (Doc. #31-5, at 13.) On one occasion, the State of Alabama accused Pitts of failing to pay the proper amount of state income tax and held a trial on the matter. At the trial, the prosecution called McLean to testify. Pitts states that McLean testified truthfully and favorably for him at the trial concerning Pitts's competence and work performance. (Doc. #31-5, at 36–37.) There was, however, one source of tension between Pitts and McLean. Throughout the course of Pitts's employment at the PSC, he maintained outside employment as a partner in an accounting firm. Pitts admits that he would take leave from his job at the PSC to work at his outside job. (Doc. #31-5, at 33.) Pitts states that he earned between $400,000 and $500,000 from his outside job in 2004 and over $100,000 in 2010. (Doc. #31-5, at 34, 36.) McLean states that Pitts failed to comply with her leave and attendance policies and that he was the only employee who continued to have leave and attendance issues after she required salaried employees to keep time sheets. When McLean learned that Pitts had filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), she asked him why he was making allegations against her because she believed they had a good working relationship. Pitts replied that filing the EEOC charge was something he had to do in order to get a settlement from the PSC.[3] (Doc. #31-14.)

## C. Pitts's Termination and Failure to Re-hire

After the November 2010 election, all state agencies were informed there would be

---

[3] Pitts's statement is not hearsay because it is an opposing party's statement. Fed. R. Evid. 801(d)(2). Pitts does not dispute that he made this statement.

8

a reduction in their appropriations due to the financial downturn. As a result, the PSC commissioners began looking for ways to make budget cuts. At a meeting held on December 3, 2010, then-President Baxley met with the six unclassified, at-will employees of the PSC, including Pitts, and advised them that the commissioners were considering eliminating their positions. It was generally understood that the formal consideration on separation of the Act 44 employees would occur at the December 7, 2010 public meeting of the commissioners. On December 7, 2010, Cavanaugh, Dunn, and Baxley met and made the decision to separate the Act 44 employees but delayed voting on this item until the January 4, 2011 meeting. The commissioners delayed the vote because they did not want to terminate the employees shortly before the holidays. The commissioners were not aware Pitts had filed an EEOC charge at the December 7, 2010 meeting because Pitts did not file his first EEOC charge until December 10, 2010. The commissioners were aware Pitts had filed an EEOC charge when they formally voted to separate the Act 44 employees on January 4, 2011. The commissioners terminated all six Act 44 employees at the PSC, which consisted of the following: Pitts (black male), Pitts's supervisor McLean (white female), Janice Hamilton (black female), Rolland Casey (white male), Thomas Samford, IV (white male), and Clarence Duncan (black male).

Although he had never applied for a promotion in his twenty years of service at the PSC, Pitts sent a memorandum to McLean on December 8, 2010, one day after the decision to separate the Act 44 employees, expressing his desire to be considered for the Public Utility Analyst Manager ("PUAM") position. At the time Pitts sent the memorandum to McLean,

the register for the PUAM position was closed. Pitts had never sent an application for the position and was not on the register. Clarence Duncan ("Duncan"), a black male and one of the other Act 44 employees who was terminated from his at-will position, had applied for the PUAM position and was on the register for the job. Based on his qualifications, Duncan was ranked in band 1 on the Certificate of Eligibles. Duncan received the position by decision of the commissioners at their January 4, 2011 meeting. In order for Pitts to have been considered for the PUAM position, he would have had to request the PSC to re-open the register for the position, which had never been done before by Cavanaugh, Dunn, or Baxley. Although Duncan was terminated as an Act 44 employee, he transferred into the PUAM position, which was a merit system position.

Another Act 44 employee, Janice Hamilton ("Hamilton"), a black female, had her recently-terminated at-will position converted into a merit system position. The position was for Energy Division Director. Because she had performed the same job when it was an at-will position, Hamilton was provisionally appointed to the new position. However, it took until November 1, 2011 for the Energy Division Director position to become a merit system position. In the intervening time, people could apply for the yet-to-be created merit system position. Both Pitts and Hamilton applied for the position. Hamilton was ranked first on the Certificate of Eligibles, and subsequently received the job of Energy Division Director on November 1, 2011.

The remaining Act 44 employees who were terminated but not transferred to merit system positions, like Duncan and Hamilton, were all offered severance packages. Pitts was

10

the only separated Act 44 employee who did not accept his severance package because he refused to waive his right to take legal action against the PSC, which was a condition of accepting the severance agreement. (Doc. #31-5, at 48.) Thus, although the remaining severed Act 44 employees who received severance packages (McLean, Casey, and Samford) were all white, this was because Duncan and Hamilton (both black) received merit system positions with the PSC and Pitts voluntarily refused to accept a severance package because he did not want to waive his right to sue the PSC.

## IV. DISCUSSION

Pitts brings claims against the PSC for race discrimination under Title VII for disparate treatment (Count I), retaliatory termination (Count II), and retaliatory failure to re-hire (Count III). Pitts brings claims against Cavanaugh, Dunn, and Baxley in their individual capacities for race discrimination under 42 U.S.C. § 1981 via § 1983 for retaliatory termination (Count IV) and retaliatory failure to re-hire (Count V).[4]  Pitts also brings claims against Cavanaugh, Dunn, and Baxley in their official capacities for prospective injunctive relief only under § 1981 for retaliatory termination (Count VI) and retaliatory failure to re-hire (Count VII).[5]

---

[4] Section 1983 constitutes the exclusive federal remedy for violation by state actors of the rights guaranteed under § 1981. *See Bryant v. Jones*, 575 F.3d 1281, 1288 n. 1 (11th Cir. 2009). Therefore, Pitts's § 1981 and § 1983 claims merge. *See Vason v. City of Montgomery*, 240 F.3d, 905, 906 (11th Cir. 2001). For ease of reference, the Court will refer to these claims as § 1981 claims since the substantive rights of that statute apply but with the lack of respondeat superior liability pursuant to § 1983. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989).

[5] While it is clear from Pitts's Amended Complaint, Pitts further clarifies in his response brief that he has not brought claims for disparate treatment, loss of promotional opportunities, or

11

### A.     Disparate Treatment

Pitts brings a Title VII claim against the PSC in Count I of his Complaint for disparate treatment based on instances of perceived mistreatment by his supervisor, McLean. Since this is not a case where there is direct evidence of discrimination, Pitts must use the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to establish a prima facie case of disparate treatment based on race. To establish a prima facie case of disparate treatment, a plaintiff must present evidence that (1) he belongs to a protected class; (2) he was subjected to an adverse employment action; (3) the employer treated similarly situated employees outside of his protected class more favorably; and (4) he was qualified to do the job. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (citations omitted). Pitts fails even to establish a prima facie case of disparate treatment because none of the actions taken by McLean, whether individually or collectively, rise to the level of an adverse employment action. Further, aside from Pitts's claims that McLean spoke to him about maintaining at least 100 hours of leave and that McLean did not reprimand white employees who came in late, Pitts has failed to present any evidence that McLean treated white employees more favorably with respect to the actions Pitts claims were adverse.

One element of a *McDonnell Douglas* circumstantial case that Pitts must show is that the PSC took an adverse employment action against him. To prove an employer took an

---

money damages against the individual defendants in their official capacities. (Doc. #35, at 1 n. 1.)

adverse employment action, an employee "must show a *serious and material* change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."). Whether an employment action is materially adverse is based on the viewpoint of a reasonable person in the employee's circumstances and not on the employee's subjective view of the action. *Id.*

Even assuming Pitts can show McLean's actions towards him were because of his race (which the evidence strongly suggests they were not), he cannot show that they constituted a "serious and material change in the terms, conditions, or privileges" of his employment. *Davis*, 245 F.3d at 1239. Pitts claims McLean "required" him to maintain more than 100 hours of accumulated vacation time, but also admits that she spoke with him about maintaining 100 hours of leave time only twice in his twenty years of employment at the PSC and that McLean never disciplined him in any way for failing to maintain 100 hours of leave. McLean's requirement that salaried employees maintain time sheets likewise resulted in no discipline, loss of pay or benefits, or change of title or position for Pitts. Even assuming McLean had Byrd and Parker specifically monitor Pitts's attendance (which is contradicted by the evidence), Pitts was never disciplined and never suffered any loss of pay, benefits, or position based on this supposed monitoring. Taking Pitts's claim that McLean would reprimand him for coming in late but not reprimand two white employees who came in late

13

as true, this falls far below the conduct in *Davis*, which the Eleventh Circuit held was insufficiently adverse to violate Title VII. *See Davis*, 245 F.3d at 1240–46 (placing memorandum in employee's file reprimanding employee and twice removing police officer from "officer-in-charge" position insufficiently adverse). McLean asking Pitts to do tax returns for her parents is not an adverse employment action because Pitts admits he agreed to do it and that he did not express any misgivings to McLean about doing them. Finally, with respect to Pitts's allegations that McLean modified his leave slips to reflect he was out of the office even though he was present, Pitts admits that on both occasions when he disputed McLean's alterations, he discussed the matter with her and she corrected the slips. Pitts thus presents no evidence that McLean denied him leave or that he suffered any economic harm or denial of benefits from these incidents. Pitts has failed to present sufficient evidence to show that he suffered an adverse employment action. "Simply put, the loss of prestige or self-esteem felt by an employee who receives what he believes to be unwarranted job criticism or performance review will rarely–without more–establish the adverse action necessary to pursue a claim under Title VII's anti-discrimination clause." *Id*. at 1242.

In addition to the above actions being insufficient to constitute adverse employment actions, Pitts has failed to show that he was treated less favorably with respect to most of these actions than non-black employees. McLean indisputably implemented the time sheet requirement for all salaried employees in the division, not just Pitts. Pitts also fails to create a dispute of fact about McLean's supposed "monitoring" of him by Byrd and Parker. Byrd

14

and Parker generally monitored employees in the division for compliance with McLean's sign-in and sign-out requirement. Finally, McLean's policy that employees keep 100 hours of leave in case of an emergency was a general policy, and the fact that she discussed it with Pitts only twice in his twenty years of employment at the PSC is unrebutted evidence that she did not discuss this policy selectively with Pitts based on his race. In conclusion, since Pitts has failed to establish a prima facie case of disparate treatment against the PSC based on McLean's actions, summary judgment is due to be GRANTED in favor of the PSC on Pitts's Title VII disparate treatment claim in Count I.[6]

## B.     Retaliatory Termination

Pitts brings claims for retaliation based on his termination against the PSC under Title VII (Count II), against Cavanaugh, Dunn, and Baxley in their individual capacities under § 1981 (Count IV), and against Cavanaugh, Dunn, and Baxley in their official capacities under § 1981 for injunctive relief (Count VI). To establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate: (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) that the adverse employment action was causally related to the protected activity. *Harper v. Blockbuster Entm't Corp.*,

---

[6] Although Pitts characterize's McLean's actions as "harassment," his Amended Complaint does not include a claim for racial harassment or hostile work environment, and his brief in opposition to summary judgment does not address the PSC's motion for summary judgment as to these claims. Any claim for hostile work environment is thus deemed abandoned by Pitts. Even assuming Pitts had brought a claim for racial harassment, McLean's actions are neither objectively hostile nor were they severe and pervasive. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (stating elements of racially hostile work environment claim).

139 F.3d 1385, 1388 (11th Cir. 1998).[7] In the context of a retaliation claim, an adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 (2006)). The Supreme Court recently held that causation for Title VII retaliation claims "must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m)," which requires only that the protected characteristic is "a motivating factor" behind the adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). That is, the employee's engaging in statutorily protected activity must be the but for cause of the employer's adverse employment action.[8] If the employee establishes a prima facie case of retaliation, then the burden shifts to the employer to produce legitimate reasons for the adverse employment action. *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 (11th Cir. 2001). If the employer does so, the employee must then show that the reasons given by the employer were pretextual. *Id*.

Pitts's retaliation claim based on his December 10, 2010 filing of an EEOC charge and

---

[7] The analysis for a Title VII and § 1981 retaliation claim are the same. *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

[8] In *Parker v. Chilton County Board of Education*, No. 12-cv-650, 2014 WL 116341, at *10 n. 9 (M.D. Ala. Jan. 13, 2014), this Court held that *Nassar*'s but-for causation requirement applied to claims under § 1981 and the Court so holds here. As the PSC also points out, this Court has held that *Nassar*'s but-for causation requirement applies at the prima facie stage of a retaliation claim, rather than at the pretext stage. *See Green v. MOBIS Ala., LLC*, No. 12-cv-277, __ F.Supp. 2d. __, 2014 WL 457683, at *18 (M.D. Ala. Feb. 5, 2014); *Parker*, 2014 WL 116341, at *10. The Court reiterates that holding here.

16

his January 4, 2011 termination fails because he cannot establish causation. Cavanaugh, Dunn, and Baxley state that they made the decision to terminate all Act 44 employees, including Pitts, at the December 7, 2010 meeting of the PSC commissioners. Thus, the commissioners were not aware of Pitts engaging in any statutorily protected activity at the time they made the decision to terminate him. Although the January 4, 2011 vote resulted in the formal termination of the Act 44 employees, the decision had been made at the December 7, 2010 meeting and the PSC had merely delayed implementing their decision until after the holidays. Pitts has presented no evidence to contradict the commissioner's affidavits that they made the decision to terminate the Act 44 employees before Pitts filed his EEOC charge and without any knowledge of his future opposition to alleged race discrimination. Therefore, summary judgment is due to be GRANTED in favor of the PSC and Cavanaugh, Dunn, and Baxley in their individual and official capacities for Counts II, IV, and VI.

**C.     Retaliatory Failure to Re-Hire**

Pitts brings a separate retaliation claim based on the failure of the PSC to re-hire him after his January 4, 2011 termination against the PSC under Title VII (Count III), against Cavanaugh, Dunn, and Baxley in their individual capacities under § 1981 (Count V), and against Cavanaugh, Dunn, and Baxley in their official capacities for injunctive relief under § 1981 (Count VII). Pitts argues that Duncan, a black male who did not file an EEOC charge, received the PUAM position on January 4, 2011, the same day Duncan was terminated from his at-will position. Pitts also argues that Hamilton, a black female who did

17

not file an EEOC charge, received an interim position as Energy Division Director and later received the same position once it was converted to a merit system position. Pitts has established that he engaged in statutorily protected activity by filing an EEOC charge on December 10, 2011, and that he suffered an adverse employment action by not being re-hired into either position. He has also established causation for the purposes of his prima facie case by showing the commissioners were aware of his protected conduct on January 4, 2011, and that there was a very close temporal proximity between the filing of his EEOC charge and the adverse employment actions. *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (holding causation established where supervisors were aware employee had filed EEOC charge and employee was fired seven weeks later). The burden of production thus shifts to the PSC to produce a legitimate non-retaliatory reason for failing to re-hire Pitts to either position.

    1.  **The PUAM Position**

  Duncan, rather than Pitts, was hired for the PUAM position because Duncan applied for it and Pitts did not. Pitts did not apply for the position and the register for the position was closed when Pitts wrote a memorandum to McLean on December 8, 2010, expressing his desire to be considered for the position. Clearly, the PSC's failure to hire Pitts because he did not apply for and was not on the register of employees to be considered for the position is a legitimate, non-retaliatory reason for failing to re-hire Pitts. The fact that the commissioners could have, but did not, re-open the register to allow Pitts to apply does not create a genuine dispute on pretext, especially in light of the fact that the commissioners have

never re-opened a closed register to allow another employee to apply for a position.

### 2. The Energy Division Director Position

Hamilton, rather than Pitts, had her at-will position converted into an interim position until it could be converted into a merit system position because the interim position was the same job she had performed on an at-will basis. Pitts applied for the position in June 2011 since Hamilton had to be considered separately for the position once it became a merit system position. Hamilton, rather than Pitts, was hired for the merit system position in November 2011 because she was ranked first on the Certificate of Eligibles. Pitts's argument that Hamilton had been previously found guilty of ethical improprieties is insufficient to create a genuine dispute on pretext because it does not show that the PSC's reasons for hiring Hamilton, namely, that she had already performed the same job on an at-will basis, were not the reasons for hiring Hamilton and that the PSC's real reasons were a desire to retaliate. As a result, summary judgment is due to be GRANTED in favor of the PSC on Counts III, V, and VII.

## V. CONCLUSION

Based on the foregoing, it is hereby ORDERED as follows:

1. The PSC's Motion for Summary Judgment (Doc. #29) is GRANTED as to all claims, and Pitts's Amended Complaint is DISMISSED WITH PREJUDICE.

2. The pretrial hearing and trial of this case are CANCELLED.

Because this Memorandum Opinion and Order resolves all claims in this case, the Clerk of Court is directed to close the file. A separate final judgment will be entered in

accordance with this Memorandum Opinion and Order.

DONE this the 23rd day of July, 2014.

>                    /s/ Mark E. Fuller
>           UNITED STATES DISTRICT JUDGE